**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 15-2595

HAMILTON PARK HEALTH CARE CENTER LTD,

Appellant

v.

1199 SEIU UNITED HEALTHCARE WORKERS EAST

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 3-13-cv-00621)
District Judge: Honorable Mary L. Cooper

Submitted Under Third Circuit LAR 34.1(a)
February 29, 2016

Before: AMBRO, JORDAN, and SCIRICA, <u>Circuit Judges</u>

(Opinion filed: April 1, 2016)

David Jasinski, Esquire
Jennifer C. Van Syckle, Esquire
Rebecca D. Winkelstein, Esquire
Jasinksi, P.C.
60 Park Place, 8th Floor
Newark, NJ   07102

      Counsel for Appellant

Katherine H. Hansen, Esquire
William S. Massey, Esquire
Gladstein, Reif & Meginniss, LLP
817 Broadway, 6th Floor
New York, NY   10003

      Counsel for Appellee

---

OPINION  OF  THE  COURT

---

AMBRO, <u>Circuit Judge</u>

Hamilton Park Health Care Center filed a petition to vacate an arbitration award in a dispute with the 1199 SEIU United Healthcare Workers East union. The District Court denied the petition and confirmed the award. On appeal, Hamilton Park asserts that the Court erred by approving a multi-year arbitration award when the parties' collective bargaining agreement ("CBA") only contemplated a single-year award. Because the parties consented at arbitration to a multi-year award, we affirm this portion of the Court's order.

Hamilton Park also argues that, even if a multi-year award is permissible, the Court should have severed a provision authorizing a new round of arbitration at a later date. We agree; thus we reverse and remand as to this portion of the order.

## I. Background

Hamilton Park is a long-term care facility that was previously a member of a multi-employer bargaining group. Morris Tuchman, Esq. represented the group (referred to as "Tuchman Homes") in negotiations with 1199 SEIU, which was the exclusive bargaining agent for the group's employees (subject to exceptions not at issue here).[1] In 2008, Tuchman Homes and the union agreed to a CBA beginning on March 13 of that year and extending through February 28, 2013. The CBA gave the union the option to reopen negotiations in November 2011 to bargain for new wages, hours, and general terms and conditions of employment for the CBA's last year (February 28, 2012–February 28, 2013). If the union exercised its right to reopen and the parties did not agree to terms by February 28, 2012, they could submit any unresolved items to binding interest arbitration.[2]

---

[1] We use "Tuchman Homes" to refer to the bargaining group, and we use "Tuchman" to refer to Mr. Tuchman.

[2] In interest arbitration, the parties ask the arbitrator "to set new terms and conditions of employment." *Lodge 802, Int'l Bhd. of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers & Helpers, AFL-CIO v. Pa. Shipbuilding Co.*, 835 F.2d 1045, 1046 (3d Cir. 1987). By contrast, in rights arbitration, which is not at issue here, the arbitrator's role "is to resolve disputes involving the interpretation or application

The CBA provides that it cannot be changed "unless in writing, and signed by the authorized representatives of the parties." It also says that the arbitrator cannot "add to, subtract from, or otherwise amend or modify the terms of this Agreement." Although the CBA only authorizes interest arbitration for the contract's last year, it does not expressly bar any other types of arbitration. Finally, the CBA empowers the arbitrator to "determine his jurisdiction" and grant "all appropriate remedies."

In November 2011, the union invoked its right to reopen negotiations. The parties reached an impasse, and they submitted the unresolved issues to arbitration. One of the main sticking points was the 4.5 percentage point increase in contributions that was necessary to maintain the level of health benefits that employees received. The union wanted Tuchman Homes to cover the entire increase, but the latter opposed paying any of it. During a hearing on March 26, 2012, the arbitrator, Martin Scheinman, Esq., suggested that the parties consider allowing him to fashion a multi-year award that went beyond the scope of the February 28, 2012– February 28, 2013 jurisdiction provided by the CBA. The purpose of this would be to spread out increased employer contributions over a longer period of time. As Scheinman recounted in the award he ultimately issued, the parties "tentatively" agreed to the request for expanded jurisdiction. He said that, in subsequent *ex parte* meetings, they firmly committed to this plan. Specifically, he said that "[b]oth sides agreed my jurisdiction permitted a multi-year Award, at my discretion." However, these agreements were never in writing.

---

of terms and conditions of employment that the parties have themselves agreed to in their contract." *Id.* at 1047.

4

In November 2012, Scheinman issued a multi-year award that extended through June 2016. It dealt with, among other topics, wages and health benefits contributions. With respect to the dispute over health benefits, the award called for a 2 percentage point increase in employer contributions at the outset followed by a further 2.5 percentage point increase in March 2014.

Scheinman also included a provision allowing the union to reopen negotiations for the contract's last year (June 30, 2015–June 30, 2016) and to submit any resulting disputes to binding interest arbitration. The effect of Scheinman's award was to create what courts frequently call a "second generation" interest arbitration agreement. *See, e.g., Globe Newspaper Co. v. Int'l Ass'n of Machinists*, 648 F. Supp. 2d 193, 198 (D. Mass. 2009). As the name implies, this refers to a scenario where an arbitrator uses his authority to decide a particular dispute to impose a requirement, not previously agreed upon by the parties, to arbitrate future disputes.

Scheinman did not address why he included the second generation interest arbitration provision. Nor did he ever conclude that the parties consented to it. He did, however, explain his reasoning for including a reopener provision. He said he "followed the parties' format," derived from the 2008–2013 CBA, of permitting the union to reopen negotiations for the contract's last year. In both the 2008–2013 CBA and Scheinman's award, the reopener and arbitration provisions work in tandem (reopening followed, if need be, by arbitration). It appears that Scheinman presumed that the parties, having once (in the 2008–2013 CBA) elected to resolve disputes through interest arbitration, would continue to choose that model for future disputes.

Hamilton Park responded to the award by filing a petition in the District Court to vacate it. The crux of its

5

argument was that Scheinman exceeded his authority under the CBA by issuing a multi-year award instead of confining himself to the year ending February 28, 2013 and by inserting a second generation interest arbitration provision. Hamilton Park's position was that it did not provide oral consent for Scheinman's actions and that, even if it had, it would be insufficient because the CBA requires written authorization.

In support of the contention that it never provided consent, Hamilton Park submitted to the Court a letter its counsel had written to Tuchman along with an unsigned declaration from Tuchman that was attached to the letter. The letter stated that Hamilton Park's counsel had spoken with Tuchman and prepared the declaration on his behalf based on that discussion. It closed by asking Tuchman to execute the declaration, which asserted that he "never consented to any modification of the CBA authorizing Scheinman to issue an award beyond one year." However, Hamilton Park later informed the Court that Tuchman refused to sign the declaration.

Hamilton Park also submitted declarations from its chief financial officer, Donald Wuertz, and from Jacqueline Cousins, an administrator at Cranford Health and Extended Care, another member of the Tuchman Homes multi-employer bargaining group. The declarations said that neither the group as a whole nor Hamilton Park individually gave Scheinman or Tuchman authorization for a multi-year award. But they are silent on whether Tuchman, as the group's representative, authorized Scheinman to issue such an award.

## II. Jurisdiction and Standard of Review

The District Court had jurisdiction under 9 U.S.C. § 10 and 9 U.S.C. § 11, and we have jurisdiction per 9 U.S.C. § 16(a)(1)(D) and 28 U.S.C. § 1291. "When reviewing a

6

district court's denial of a motion to vacate an arbitration award, we review its legal conclusions de novo and its factual findings for clear error." *Whitehead v. Pullman Grp., LLC*, 811 F.3d 116, 119 n.23 (3d Cir. 2016).

## III. Discussion

"There is a strong presumption under the Federal Arbitration Act ["FAA"] in favor of enforcing arbitration awards." *Brentwood Med. Assocs. v. United Mine Workers of Am.*, 396 F.3d 237, 241 (3d Cir. 2005) (internal citation omitted). We review them under an "extremely deferential standard," the application of which "is generally to affirm easily the arbitration award." *Dluhos v. Strasberg*, 321 F.3d 365, 370 (3d Cir. 2003). This deference, of course, is subject to certain limitations. Indeed, "[e]ffusively deferential language notwithstanding, the courts are neither entitled nor encouraged simply to 'rubber stamp' the interpretations and decisions of arbitrators." *Matteson v. Ryder Sys. Inc.*, 99 F.3d 108, 113 (3d Cir. 1996).

For instance, the FAA gives district courts the authority to vacate awards where arbitrators "exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4). Also subject to vacatur are awards that "do[] not draw [their] essence from the terms of the collective bargaining agreement," *Jersey Nurses Econ. Sec. Org. v. Roxbury Med. Grp.*, 868 F.2d 88, 88 (3d Cir. 1989), that result from an arbitrator's "own brand of industrial justice," *Citgo Asphalt Ref. Co. v. Paper, Allied-Indus., Chem. & Energy Workers Int'l Union Local No. 2-991*, 385 F.3d 809, 816 (3d Cir. 2004) (internal quotation marks omitted), or that are contrary to "a well-defined and dominant public policy," *Exxon Shipping Co. v. Exxon Seamen's Union*, 993 F.2d 357, 360 (3d Cir. 1993) (internal

7

quotation marks omitted). With respect to the last category, because we are dealing with a CBA between a union and an employer, the public policy considerations embodied in the National Labor Relations Act ("NLRA") are particularly relevant. Moreover, district courts can modify awards in cases where "arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted." 9 U.S.C. § 11(b).

There are two aspects of the arbitration award that Hamilton Park asks us to review. The first is the issuance of a multi-year award. Because the CBA only authorizes a single-year award, Hamilton Park would be on solid footing if it had not separately agreed to expand Scheinman's jurisdiction. But it did reach such an agreement, and it is bound by it.

The other issue is the inclusion of a second generation interest arbitration provision. Here, by contrast, there is no evidence that Hamilton Park consented to what Scheinman included. Because this portion of the award violates the principles of both the FAA and the NLRA, it cannot stand.

*A. Multi-year award*

Hamilton Park's main contention is that there is no authority in the CBA for Scheinman to issue an award that goes through June 2016. This is true but ultimately not dispositive. That is because parties are permitted to "agree to allow an arbitrator to go beyond the express terms of the collective bargaining agreement." *High Concrete Structures, Inc. of N.J. v. United Elec. Radio & Mach. Workers of Am., Local 166*, 879 F.2d 1215, 1218 (3d Cir. 1989). Here, Scheinman found that the parties made such an agreement. Specifically, his award states that "[b]oth sides agreed" to a "multi-year Award, at my discretion."

8

Meanwhile, Hamilton Park has presented no evidence sufficient to demonstrate that the agreement did not exist. The only evidence it produced shows that neither it nor other members of the bargaining group authorized Tuchman or Scheinman to issue a multi-year award. But there is no competent evidence that Tuchman did not agree to the longer award on behalf of the bargaining group.

That evidence might have come in the form of a signed declaration from Tuchman. But, as discussed, Tuchman declined to sign it. We do not assume that Tuchman's refusal to sign the declaration is necessarily the same as a repudiation of its contents. Indeed, we note that counsel for Hamilton Park represented to the District Court that Tuchman, though he refused to sign the document, "did not deny that he did not authorize Arbitrator Scheinman to issue an award beyond one year." On appeal, Hamilton Park vigorously challenges the arbitration award *but fails to mention—even once—that Tuchman refused to sign a declaration that counsel had submitted to the District Court*. The Magistrate Judge found the circumstances surrounding the declaration to be "troubling[]." No doubt. And even more troubling is Hamilton Park's failure to acknowledge the incident in its briefing.

Hamilton Park places great emphasis on the lack of any writing memorializing the agreement to authorize a multi-year award. It argues that an oral agreement would violate the CBA, which requires any changes to be in writing and signed by authorized representatives. But we have held that, once parties are in front of an arbitrator, their decision to submit additional subjects to arbitration—even those beyond the scope of the CBA—need not be "express" and instead "may be based on other relevant . . . actions." *High Concrete Structures*, 879 F.2d at 1219. Indeed, an agreement to allow an arbitrator to address particular issues "may be implied

9

from the conduct of the parties." *Teamsters Local Union No. 764 v. J.H. Merritt & Co.*, 770 F.2d 40, 42 (3d Cir. 1985). In our case, the parties' relevant conduct was to authorize Scheinman to enter a multi-year award. And the evidence of this is Scheinman's acknowledgement of the agreement in his award.

The CBA's writing requirement thus does not get Hamilton Park relief from its agreement. For instance, in *High Concrete Structures* the employer argued that the arbitration award, which went beyond the terms of the CBA, violated both the clause declaring the agreement to be complete and final (*i.e.*, an integration clause) and the provision preventing the arbitrator from changing the agreement's terms. We disagreed, observing that nothing in the CBA expressly "prohibit[ed] the parties from agreeing to a submission which is broader." 879 F.2d at 1219 ("[I]n determining the arbitrator's authority, the court must look not only at the text of the collective bargaining agreement but also at the agreed submission."). Similarly, nothing in the CBA prohibited Hamilton Park and the union from agreeing to arbitrate additional issues.

There are important policy considerations behind the rule from *J.H. Merritt* and *High Concrete Structures*. Specifically, there is a "strong federal policy favoring the speedy resolution of labor disputes through arbitration." *J.H. Merritt*, 770 F.2d at 43. If a party, through its actions, were able to induce an arbitrator to issue an award outside the CBA and then challenge that award if it is unhappy with it, this policy would be frustrated. *Id.* Hamilton Park, having agreed to go beyond the CBA, is bound by that determination.

As a result, we cannot say that Scheinman "exceeded [his] powers" within the meaning of the FAA. *See* 9 U.S.C. § 10(a)(4). Nor does the award fail to "draw its essence from

10

the terms of the collective bargaining agreement," *Jersey Nurses*, 868 F.2d at 88, because that requirement poses no obstacle where the parties agree to go beyond the scope of the CBA, *High Concrete Structures*, 879 F.2d at 1219. Meanwhile, there is no tension with a "well-defined and dominant public policy," *Exxon Shipping*, 993 F.2d at 360 (internal quotation marks omitted), as holding parties to their representations to an arbitrator by no means contravenes public policy. Finally, there are no concerns about an arbitrator meting out his "own brand of industrial justice," *Citgo Asphalt*, 385 F.3d at 816 (internal quotation marks omitted), or giving an award based on "a matter not submitted" for arbitration, 9 U.S.C. § 11(b), because here the evidence demonstrates that Scheinman had the parties' authorization.

In one respect, however, the District Court erred in its analysis. Specifically, it determined that "the Court cannot challenge Arbitrator Scheinman's finding that the parties consented to expanding his jurisdiction." For this, the Court relied on the proposition that, as a general matter, we will not "reconsider the merits of an [arbitration] award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract." *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 36 (1987). However, this analysis overlooks two considerations. The first is that courts are authorized to review challenges that go "to the making of the agreement to arbitrate." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445 (2006) (internal quotation marks omitted). The second is that we can inquire into whether an award is obtained "through the arbitrator's dishonesty." *Misco*, 484 U.S. at 38. All of this goes to say that our deferential review of arbitration awards does not deprive Hamilton Park of the ability to establish that, contrary to Scheinman's representations, it did not agree to a multi-year

11

award. The fatal flaw for Hamilton Park, however, is that it has not done so.

*B. Second generation interest arbitration provision*

The next issue is Scheinman's inclusion of a second generation interest arbitration provision, which allows the union to force arbitration on any disputes that arise during negotiations over the award's last year (June 30, 2015–June 30, 2016). This is not a question of Scheinman's authority to issue an award covering the year ending June 30, 2016. Rather, it is purely a question of the remedy that he imposed.[3] And unlike with the extension of jurisdiction to encompass a multi-year award, Scheinman did not find that the parties agreed to a new arbitration provision. Because Hamilton Park did not consent to the provision, its inclusion is contrary to both the FAA and the NLRA. Although this is a matter of first impression for us, we join the company of several of our sister courts that have found second generation interest arbitration provisions to be impermissible without mutual consent.

As a starting point, under the FAA arbitration "is strictly a matter of contract." *Bel-Ray Co. v. Chemrite (Pty) Ltd.*, 181 F.3d 435, 444 (3d Cir. 1999). As a result, a basic premise is that we "initially must find that there is a valid agreement to arbitrate." *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 523 (3d Cir. 2009). And "[i]f a party has not agreed to arbitrate, the courts have no authority to mandate that [it] do so." *Bel-Ray*, 181

---

[3] The parties gave Scheinman the authority to impose all "appropriate remedies." The key word, of course, is "appropriate." We must therefore determine whether the arbitration provision is permissible.

12

F.3d at 444. Where a party has not executed an express agreement to arbitrate, we must therefore discern whether any "traditional principles of contract and agency law" can make it nonetheless bound by an arbitration provision. *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 194 (3d Cir. 2001) (internal quotation marks omitted).

Here, the initial contract was the CBA. The parties subsequently enlarged Scheinman's authority under the oral agreement to permit a multi-year award. However, neither the CBA nor the oral agreement contemplated the arbitration of disputes for the year starting June 30, 2015. Nor did Hamilton Park, through its conduct, imply that it agreed to such a provision. It certainly was permitted—similar to what it did when it consented to the longer award—to agree to a new arbitration provision. But there is no evidence that it did.

To the extent Scheinman attempted to infer Hamilton Park's consent by reference to the arbitration provision in the 2008–2013 agreement, that inference was flawed. Under this reasoning, Hamilton Park's agreement to arbitrate disputes for that contract's last year (February 28, 2012–February 28, 2013) means that it would consent to having the same arrangement in place for the new award's last year (June 30, 2015–June 30, 2016). But neither Scheinman in his award nor the union on appeal has identified any principle of contract or agency law that would require a party to arbitrate in the future merely because it has agreed to do so in the past.

The District Court notes that Hamilton Park, in agreeing to a multi-year award, never expressly "defin[ed] the boundaries" of Scheinman's discretion and never objected during the arbitration process to the inclusion of the second generation interest arbitration provision. But this gets things backwards. Our starting principle is not that parties can be

13

forced to arbitrate unless they agree otherwise, but rather that "[i]f a party has not agreed to arbitrate, the courts have no authority to mandate that [it] do so." *Bel-Ray*, 181 F.3d at 444. And even assuming there might be circumstances where a lack of objection can signal consent, this is not one of them. There is no evidence that Hamilton Park had any reason to suspect prior to the issuance of the award that it would contain a second generation interest arbitration provision. A party cannot object to what it cannot reasonably foresee.

Apart from being untethered from the principles embodied in the FAA, the second generation interest arbitration provision also conflicts with the NLRA's public policy considerations. Under the NLRA, employers and unions are required to bargain over "wages, hours, and other terms and conditions of employment." *Brockway Motor Trucks, Div. of Mack Trucks, Inc. v. NLRB*, 582 F.2d 720, 725 (3d Cir. 1978) (internal quotation marks omitted). On these subjects, the parties have an obligation to negotiate in good faith. *NLRB v. Wooster Div. of Borg-Warner Corp.*, 356 U.S. 342, 349 (1958). By limiting mandatory bargaining to these topics, the NLRA embodies the public policy that, for all other subjects, parties are "free to bargain or not to bargain, and to agree or not to agree." *Id.*

The question of whether to require arbitration does not relate to any of the mandatory bargaining subjects. As a result, the NLRA allows parties to accept or reject an arbitration provision as they see fit. However, if arbitrators were free to do as Scheinman did here, parties would have no control over the continued inclusion of an arbitration provision. This would allow for an end-run around the NLRA's public policy considerations.

To see how this problem plays out in practice, we start with the undisputed premise that, because an arbitration

14

provision is not a mandatory subject of bargaining, Hamilton Park was under no obligation to agree to arbitration in the 2008–2013 CBA. It is only because Hamilton Park reached a limited agreement—the inclusion of an arbitration provision in a single CBA—that Scheinman was involved in the case in the first instance. He then used this agreement to expand Hamilton Park's arbitration requirements. If an arbitrator, once empowered to decide a particular dispute, could then require all future disputes to be arbitrated, a party that has once agreed to a limited arbitration provision could forever be held hostage to it. As the Fifth Circuit explained,

> a party . . . may find itself locked into that procedure for as long as the bargaining relationship endures. Exertion of economic force to rid oneself of the clause is foreclosed, for the continued inclusion of the term is for resolution by [the arbitrator, who is] an outsider. Parties may justly fear that the tendency of arbitrators would be to continue including the clause, for that is exactly what happened in this case.

*NLRB v. Columbus Printing Pressmen & Assistants' Union No. 252*, 543 F.2d 1161, 1169 (5th Cir. 1976).

Because second generation interest arbitration provisions imposed without consent violate the contract law principles of the FAA and the public policy goals of the NLRA, we hold that they are unenforceable. As discussed, there is no evidence that Hamilton Park agreed to have such a provision. Hence it must be removed from Scheinman's award.

Our holding tracks the overwhelming consensus of federal courts. *See, e.g.*, *Local Union No. 666, Int'l Bhd. of*

15

*Elec. Workers, AFL-CIO v. Stokes Elec. Serv., Inc.*, 225 F.3d 415, 425 (4th Cir. 2000); *Local 58, Int'l Bhd. of Elec. Workers, AFL-CIO v. Se. Mich. Chapter, Nat'l Elec. Contractors Ass'n, Inc.*, 43 F.3d 1026, 1032 (6th Cir. 1995); *Am. Metal Products, Inc. v. Sheet Metal Workers Int'l Ass'n Local Union No. 104*, 794 F.2d 1452, 1456–57 (9th Cir. 1986); *Sheet Metal Workers' Int'l Ass'n, Local 14 v. Aldrich Air Conditioning, Inc.*, 717 F.2d 456, 459 (8th Cir. 1983); *Columbus Printing*, 543 F.2d at 1169–7. *See also Globe Newspaper*, 648 F. Supp. 2d at 198 ("It appears that every court to have considered this question has concluded that this type of second generation interest arbitration provision is unenforceable . . . .").[4]

\* \* \* \* \*

Our deference to an arbitrator's award does not include the rubber stamping of a self-perpetuating arbitration provision that the parties did not agree to include. We therefore reverse the portion of the District Court's order approving the inclusion of a new arbitration provision for disputes arising for the year starting June 30, 2015. We remand the case with instructions for the Court to void only the portion of the award providing for that arbitration. *See,*

---

[4] The District Court notes that the typical case where a court voids a second generation interest arbitration provision occurs when the union insists on its inclusion. The Court correctly observes that there is no evidence that the union did so here, meaning that Scheinman may have included it on his own initiative. However, this has no bearing on our analysis. Even if the impetus for the provision comes from an arbitrator rather than a party, the result is the same: the imposition of a requirement to arbitrate. Unless both parties consent to that arrangement, it is unenforceable.

*e.g.*, *Buckeye Check Cashing*, 546 U.S. at 445 ("[A]n arbitration provision is severable from the remainder of the contract."). We affirm the Court's order in all other respects.[5]

---

[5] In the event that the parties have already engaged in arbitration for the June 30, 2015–June 30, 2016 contract year, nothing in this opinion prevents them from raising to the District Court any arguments that may exist as to why any or all of the resulting award should be enforced notwithstanding the invalidity of the arbitration provision.